IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL CROSSEY | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| PENNSYLVANIA STATE EDUCATION | : | |
| ASSOCIATION PENSION PLAN, et al. | : | NO. 19-1468 |

O P I N I O N

JACOB P. HART                                                                      DATE: September 3, 2019
UNITED STATES MAGISTRATE JUDGE

Michael Crossey has brought this action against the Pennsylvania State Education Association ("PSEA") Pension Plan ("the Plan"), the Plan's Board of Directors ("the Board"), and individuals who are alleged to have been directors of the Plan, in connection with action taken by the Plan to recover an alleged overpayment of benefits. Defendants seek to dismiss Crossey's complaint under Fed. R. Civ. Pr. 12(b)(6). As explained below, I will grant Defendants' motion in part, and deny it in part.

I.      Federal Rule of Civil Procedure 12(b)(6)

Under Fed. R. Civ. Pr. 12(b)(6), a party may move for the dismissal of a complaint for "failure to state a claim upon which relief can be granted." A court considering a 12(b)(6) motion will treat as true all well-pleaded facts in the complaint, which will be construed in the light most favorable to the plaintiff. Santomenno ex rel. John Hancock Trust v. John Hancock Life Insurance Co. (USA), 768 F.3d 284, 290 (3d Cir. 2014). In that light, the complaint will be considered in order to determine whether it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Sweda v. University of Pennsylvania, 923 F.3d 320, 325-6 (3d Cir. 2019), citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2007).

A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Iqbal, supra; Connelly v. Lane Construction Corp., 809 F.3d 780, 786 (3d Cir. 2016). Although the plausibility standard is less demanding than a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully. Connelly, supra, citing Iqbal, supra, and Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556 (2007). The plausibility determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, supra, at 679.

Thus, the court must therefore take three steps: (1) it must take note of the elements the plaintiff must plead to state a claim; (2) it should identify allegations that are not entitled to the assumption of truth because they are no more than conclusions; and (3) where there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. Connelly, supra, at 787, citing Iqbal, supra, and Twombly, supra, at 570.

II. Factual and Procedural Background

A. Crossey's Employment History

Crossey is a retired teacher who was formerly employed by the Keystone Oaks School District ("the School District"). Crossey's First Amended Complaint ("Complaint") at ¶22. In 2007, Crossey was elected Vice President of PSEA, which is the primary labor organization representing teachers and educational staff in Pennsylvania. Id. at ¶¶5, 23. At that time, he became an employee of PSEA, while he remained an employee of the School District. Id. at ¶24. At this time, PSEA began reimbursing the School District for the salary it paid to Crossey, and

for his contributions to the Pennsylvania Public School Employees Retirement System (PSERS") attributable to his employment with the school district. Id. at ¶24.

In 2011, Crossey was elected PSEA President. Id. at ¶ 30. In November 2013, he retired from the School District, while remaining employed as the PSEA President. ¶42. At that point, Crossey began receiving his full salary from PSEA. Id. at Exhibit F at 1. He also ceased accruing service credit under the School District Retirement System. Id. at ¶43. Crossey retired from PSEA on August 9, 2016. Id. at ¶69.

B.      Crossey's Retirement

In October, 2007, Crossey expressed interest in a feature of the Plan which allows a PSEA employee to purchase up to twelve additional years of pension plan credit if he has equivalent service credited under an educational system's retirement plan. Id. at ¶27; Exhibit A at § 6.2(a). Since Plan benefits are calculated with reference to years of service, the purchase of additional "years" increases the amount of pension benefits to which a beneficiary is entitled. Id. at Exhibit A, §2.5 (benefit accrual), 4.1 (normal or late retirement).[1]

In November, 2007, Crossey obtained an estimate of the cost to purchase twelve years of pension service credit. Id. at ¶¶27 and 28. As Crossey has stated in his Complaint, the cost estimate "considered only those wages attributable to [his] employment with PSEA." Id. at 28. Crossey did not purchase service years at that time. Id. at ¶29.

In June, 2013, however, Crossey completed an application for the purchase of service credits under the Plan. Id. at 32. The Plan's actuary recalculated the cost to Crossey of purchasing twelve years of service credit, and forwarded the calculations to PSEA's Human

---

[1] Section 4.1 reads, in part: "a Member, upon retirement on or after his/her Normal Retirement Date, shall receive a monthly pension for life equal to two percent of his/her Average Monthly Compensation for each year of Benefit Accrual Service."

3

Resources Department. Id. at ¶33. Again, the actuary considered only those wages paid to Crossey attributable to his PSEA employment. Id. at ¶35.

The cost to purchase twelve years of service credit in a lump sum was calculated as $123,838.32. Id. at ¶34. PSEA's Human Resources personnel conveyed these calculations to Crossey, who agreed to purchase the years of service at this price. Id. at ¶¶36, 38. The purchase was ratified by Todd C. Park, PSEA's Assistant Executive Director for Human Resources. Id. at ¶39. Crossey made payment by rolling over funds from his PSERS retirement account to the Plan in April, 2014. Id. at ¶¶47, 48. Oddly, there is no evidence that Crossey ever asked PSEA how much his monthly pension benefit would be (with or without the additional twelve years of service credit) before making this purchase.

In March, 2015, Crossey received from the Plan his 2014 Pension Plan Statement. According to Crossey, it estimated that, as of July 1, 2014, he would have been entitled to "a single life annuity in the amount of $3,160." Id. at ¶51. A copy of this document is not attached to his Complaint as an exhibit, but it does not appear to be disputed that this calculation took into account not only wages attributable to Crossey's employment with PSEA, but also those attributable to his employment with the School District, which were reimbursed by PSEA. Id.

In April, 2015, Crossey requested from PSEA an estimate of his retirement benefit based on an anticipated August 9, 2016, retirement date. Id. at ¶52, and Exhibit B. In December, 2015, he received from the Plan the estimate he had requested. Id. at ¶60, and Attachment 3 to Defendants' Motion to Dismiss. Apparently, these calculations were premised on information sent to the actuary by PSEA which made no distinction between the wages attributable to Crossey's PSEA employment, and the wages attributable to the School District employment. Id. at ¶¶57, 59.

4

Between April and June, 2015, Crossey communicated several times with PSEA personnel regarding his retirement options under the plan. In a document not produced in an exhibit, Crossey was apparently offered a retirement option under which he could withdraw his contributions to the payment plan in a lump sum of $153,005, and receive the balance of his pension benefit in payments of $4,165.03 during his life, with the guarantee of payments to his wife of $4,165.03 for 240 months from his retirement date if he were to die before the 240 months elapsed. May 4, 2016, email from Crossey to William Gaskins, attached to Complaint as Exhibit C.

Crossey confirmed the details of this offer in a May 4, 2016, email to William Gaskins, a PSEA human relations employee. Id. The PSEA employee replied: "Your reading of the benefit choice under 6c is correct. The $4,165.03 is guaranteed to be paid out for 240 months". June 7, 2016, email from Gaskins to Crossey, attached to Complaint as Exhibit D. Crossey confirmed the $4,165.03 amount in June, 2016, with Gaskins' successor, Jerry Oleksiak. June 23, 2016, email from Crossey to Oleksiak, attached to Complaint as Exhibit E. Crossey and his wife formally elected this retirement option on July 29, 2016. Complaint at ¶68. The amount of Crossey's benefits was confirmed to PSEA by the actuary, and the Board then approved his retirement application and the amount of his benefit. Id. at ¶¶69-70.

Crossey retired as of August 9, 2016. Id. at ¶71. His employee contributions to the Plan were rolled over into an IRA account on August 17, 2016. Id. From August 17, 2016, to March, 2018, Crossey received a monthly payment check in the amount of $4,165.03. Id. at ¶72.

5

C. <u>The March 15, 2018, Letter from PSEA</u>

In March, 2018, Crossey received a letter dated March 15, 2018, from Todd Park. Letter of March 15, 2018, attached to Complaint as Exhibit F. Its opening paragraph read:

> As a result of an extensive review conducted by PSEA, the PSEA Pension Directors have determined that there was an unintentional oversight in communicating and applying cost options under the Plan related to your purchase of 12 years of past educational service that were credited in full to your final pension benefit calculation. As a result of this oversight, an overpayment situation exists in the benefit you are receiving associated with the 12 years of purchased service at the base cost that was charged to you as further described below.

<u>Id</u>. at 1.

The letter cited Section 6.2(c) of the Plan, in explaining that, due to PSEA's "unintentional oversight": "The cost of your 12 purchase service years was based on a partial salary level, however, your benefit associated with the years purchased included the fully compensated salary you received from PSEA." <u>Id</u>. at 2. In other words, Crossey had purchased his service years at a low rate – in recognition of the fact that not all of his compensation had been paid to him by PSEA until he retired from the School District in November, 2013 – but was receiving benefits at the higher rate he would have received if all of his compensation had come from PSEA in 2011, at the time he became a PSEA employee.

The letter continued: "The result is that you have not been charged enough to sustain your current benefit payment." <u>Id</u>. It then set forth options for correcting the overpayment, which were essentially that he could (a) start receiving lower payments, with an additional reduction to pay back the overpayment; or (b) make an additional payment in order to bring his purchase price in line with the level of benefit he was receiving. (This latter choice could be accomplished in two ways, thus the reference to options 1, 2A and 2B, in the letter).

6

According to the letter, the overpayment totaled $24,836.30, as of May 14, 2018. Exhibit F at 2. That sum included the 3% interest which would be charged if repayment was made in a lump sum; if it was to be paid back over a period of time, interest at 6% would be added to the amount due. Id. The letter further stated that, if Crossey did not elect a repayment option by May 14, 2018, PSEA would "implement Option 2A as the default election." Id.

Crossey appealed this "corrective action determination" to the Board on June 12, 2018. Id. at ¶78. However, the Board denied the appeal by letter of June 21, 2018, addressed to Crossey's counsel. Id. at ¶80.

This action was filed on April 5, 2019. In it, Crossey asserts two counts under Section 502(a)(1)(B) of ERISA, 29 USC §1132(a)(1)(B). In the first, he alleges that his retirement benefit was calculated correctly under "the Plan's past practice and repeated representations." Id. at ¶¶81-88. In the second, he claims that – assuming there had been an error in the calculation of his retirement benefit – the Plan did not have the authority to recoup the resulting overpayment by offsetting it against his future benefits, or to charge interest. Id. at ¶¶ 89-99.

In a third count, Crossey seeks equitable estoppel against the Defendants under Section 502(a)(3) of ERISA, 29 USC §1132(a)(3). His fourth count is for reformation, pursuant to Section 502(a)(3) of ERISA. Crossey's fifth court seeks injunctive relief to preclude Defendants from recouping the overpayments it made to him.

III.     Discussion

A.     Crossey's First Claim Fails To State A Claim Upon Which Relief Could Be Granted

Where a benefit plan grants its administrator discretionary authority to determine eligibility for benefits or to construe the terms of a plan, a denial of benefits is to be reviewed under an "arbitrary and capricious" standard, which is identical to an "abuse of discretion" standard. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Fleisher v. Standard Insurance Co., 679 F.3d 116, 120-121 (3d Cir. 2012).

The plan at issue in this case does give the Board the power to "make all determinations as to the right of any person to a benefit under the Plan." Complaint at Exhibit A, §7.4(f). Further, the Board has the right and the responsibility to "construe and interpret the Plan, decide all questions of eligibility and determine the amount, manner and time of payment of any benefit hereunder," to "keep such records, make such reports, and do such other acts as it deems appropriate in order to comply with ERISA" and "to adopt such rules and make such determinations as are appropriate to the administration of the Plan." Id. at §7.4(g)(i)(vii) and (ix). Thus, Counts I and II of Crossey's Complaint are reviewed for abuse of discretion by the Board of Directors.

Crossey's first count, in which he maintains that his benefit was correct as it was originally calculated, was not raised before the Board. However, Defendants have construed it as a challenge to the Board's determination to reduce Crossey's monthly benefit from $4,206.74 to $3,092.89, and they argue that the Board did not abuse its discretion in this regard.

To state a claim under ERISA for improper denial of benefits, a plaintiff must allege that he is a plan participant or beneficiary; that he was due some benefit under the terms of the plan; and that the benefit was wrongfully denied by the defendant plan administrator. Bergamatto v. Bd. Of Trustees of the NYSA-ILA Pension Trust Fund, Civ. A. No. 16-5484 (KM), 2017 WL 4155225 at *5 (D.N.J. Sep. 18, 2017).

It is not disputed that Crossey is a plan participant or beneficiary, or that he was due a benefit under the plan. However, in claiming that the Board abused its discretion in denying his right to the $4,206.74 payment, on the basis that the first calculation was correct, it is clear that he has not stated a claim upon which relief could be granted, even when every inference is made in has favor. Under the language of the Plan, the initial calculation and approval by the Board of a $4,206.74 monthly benefit was erroneous.

Section 6.2 is the part of the Plan which governs "Member Contribution for Purchased Benefit Eligibility and Accrual Service Credit." Complaint at Exhibit A, §6.2. Within it, there is a special provision for individuals who, at the time they are hired by PSEA, are jointly compensated by PSEA and "another entity," such as the School District, and then later become solely compensated by PSEA. Id. at §6.2(c). This describes Crossey's situation, since he was jointly compensated by PSEA and the School District between 2007 and 2013, and then compensated solely by PSEA until his retirement in 2016.

This special provision, set forth at § 6.2(c) provides:

At his/her election, a Member described in this subsection (c) may:

(i) continue to purchase services under the payment schedule in effect at the time his/her status changes, and, if so, his/her Accrued Pension attributable to the service purchase shall be based on his/her purchased service at the computation date and his/her Average Monthly Compensation determined as if such Member had continued to be compensated by [PSEA] for the same percentage of employment for which he/she was compensated as of his/her date of hire by [PSEA]; or

9

> (ii) purchase service under a new payment schedule, which is based on the actual cost of such service to the Plan, as determined by the actuary of the Plan in accordance with the schedule set forth in Appendix C to the Plan, and earn an Accrued Pension attributable to the service purchase, based upon his/her purchase service at the computation date and his/her Average Monthly Compensation.

Id.

In short, at the time Crossey purchased years of service, he paid a lower price in accordance with the fact that he was compensated by both PSEA and the School District. Under Section 6.2(c), then, he should have received a lower benefit upon retirement, in accordance with the lower, partial salary he received from PSEA, unless he had switched to a "new payment schedule" with higher payments, so that he could obtain a higher benefit upon retirement.

Instead, Crossey continued making the lower payments as described in subsection (i) until his retirement, but at the time he retired, was erroneously given the higher payments, as described in subsection (ii). This was the basis for the language in the March 15, 2018, letter stating that Crossey had not been charged enough to sustain the benefit payment he was receiving.

Crossey argues that, in fact, he was fully compensated by PSEA since 2007, because PSEA reimbursed the school district for his salary. This is not a tenable position. For one thing, the Plan defined "compensation" as the "total remuneration received from PSEA." Complaint, Exhibit A, at Article I (Definitions). Although the School District was reimbursed, Crossey received remuneration from the School District. Further, if Crossey's argument was accepted, it would mean that he was not a School District employee since 2007, which was clearly not the case. It would also mean that he should never have been permitted to buy service credits at the low price he payed. Thus, the $4,206.74 monthly benefit payment would still be too high for the price he was charged, due to PSEA's error.

Thus, although Crossey may allude in his first Count to every necessary element under Bergamatto, the Count does not rest upon factual matter that could show that the Board's initial calculation of his benefits was correct. Count I of Crossey's complain cannot, therefore, survive Defendants' Motion to Dismiss.

B.      Count II Will Not Be Dismissed

In Crossey's second count under Section 502(a)(1)(B) of ERISA, he accurately points out that the Plan "is devoid of any provision expressly permitting [the Board] to recoup overpayments of Plan benefits by offsetting the overpayment against future benefits", and that it is also "devoid of any provision permitting it to charge interest against Plan participants in recouping overpaid Plan benefits." Complaint at ¶¶91 and 92. Therefore, he argues, the Board's actions to recover the overpayment were illegal, and its decision affirming these actions represents an abuse of its discretion.

Defendants argue that the broad authority granted to the Board in the parts of the Plan discussed above with respect to Crossey's first claim permitted it to recover the overpayments by offsetting them against future benefit payments, with interest. They argue that this corrective action was an exercise of the Board's authority to "determine the amount, manner and time of payment of [a] benefit," and to act "as it deems appropriate in order to comply with ERISA." Motion at 22. Defendants note that Department of Labor advisory opinions have stated that plan fiduciaries "must attempt to recover erroneous payments made from a plan" in accordance with their duty towards the plan. Id., citing DOL Advisory Opinions 77-08 and 77-34, attached to the Motion as Attachment 9.

There is no Third Circuit precedent precisely on this subject. However, in <u>Luby v. Teamsters Health, Welfare, and Pension Trust Funds</u>, 944 F.3d 1176, 1180 (3d Cir. 1991), the Court of Appeals for the Third Circuit stated that discretionary powers may be implied by an ERISA plan's terms even if they are not granted expressly.

Defendants also cite <u>Pilger v. Sweeney</u>, where the Court of Appeals for the Eighth Circuit affirmed the dismissal of a count in which the plaintiffs argued that the lack of explicit language in an ERISA plan prevented the defendant board of directors from recouping an overpayment of benefits by reducing future payments. 725 F.3d 922, 926 (8th Cir. 2013). The <u>Pilger</u> court found that "broad language" in the plan document granted the defendants to "both correct and recoup the overpayments." <u>Id</u>.

Other courts have found that a board managing an ERISA plan has the power to recoup accidental overpayments. Besides <u>Pilger</u>, Defendants have cited <u>Palmer v. Johnson & Johnson Pension Plan</u>, Civ. A. No. 09-572, 2009 WL 3029794 (D.N.J. Sep. 17, 2009), and <u>Johnson v. Retirement Program Plan of Certain Employers at U.S. Dep't of Energy Facilities</u>, No. 3:05-cv-5888, 2007 WL 649280 (E.D. Tenn. 2007).

Crucially, however, the <u>Palmer</u> and <u>Johnson</u> courts went on to say that a board's right of recoupment is limited by equitable factors. In <u>Johnson</u>, the United States District Court for the Eastern District of Tennessee granted summary judgment against a plaintiff who claimed that the absence of explicit language in the Plan prevented the board of directors from docking his benefits to recover an overpayment. It wrote:

> After careful consideration of the Plan and the parties' briefs, the Court first notes that, while the Plan does not have an express provision concerning overpayments, the broad language of the Plan allows for the recoupment of overpayments by defendants. … Nowhere does the Plan explicitly prohibit the recovery of overpayments. Rather, it simply does not contain a provision expressly setting forth recoupment of overpayments as an allowable action by the Plan Administrator. Because of the lack of such express

12

> language, plaintiff argues that collection of overpayments by defendants is *ipso facto* barred. In this way, plaintiff is implicitly making the argument that the Court should apply the canon of construction of *expression unius est exclusion alterius* and determine that defendants' actions are limited to those spelled out in the Plan. However, the Court cannot in good faith apply that canon in this case by virtue of the plain language of the Plan, which explicitly does not limit the responsibilities and powers of the Plan Administrator. … Thus, given the expansive and expressly unlimited language of the Plan, the Court does not believe that the Plan itself precludes defendants from collecting overpayments in the way that it has here.

No. 3:05-cv-5888, 2007 WL 649280 at **5-6.

Nevertheless, the very next sentence in the Johnson opinion reads: "However, the Court's inquiry does not end there." Id. at *6. It continues: "It must also be determined whether the principles underlying the law of trusts allow defendants to recoup overpayments made to plaintiff." Id. The Johnson court acknowledged that the trust principles which inform ERISA law can support the collections of overpayments, but it added: "[A] plan fiduciary must balance the impact of overpayments upon plan beneficiaries at large against the equitable treatment of the individuals from whom overpayments are sought." Id. at *6.

The Johnson court quoted Varity Corporation v. Howe, 516 U.S. 489 (1996), where the United States Supreme Court wrote:

> [T]here is more to plan (or trust) administration than simply complying with the specific duties imposed by the plan documents or statutory regime; it also includes the activities that are ordinary and natural means of achieving the objective of the plan.

2007 WL 649280 at *6, citing Varity, supra, at 504.

Similarly, in Palmer, the District Court for the District of New Jersey cited a Texas case in which the court wrote: "This is not a discussion of the ability of ERISA plans to recoup benefit overpayments; indeed ample case law demonstrates that plans can recoup." Civ. A. No. 09-572, 2009 WL 3029794 at *3 (D.N.J. 2009), citing Phillips v. Maritime Association – I.L.A. Local Pension Plan, 194 F. Supp.2d 549, 558 (E.D. Tex. 2001). The Palmer court granted

defendants motion to dismiss the plaintiff's 502(a)(1)(B) claim. However, it permitted the plaintiff to amend the count to add facts demonstrating hardship from the recoupment. 2009 WL 3029794 at 4.

In Phillips, which is cited in Palmer, the District Court for the Eastern District of Texas found that, despite the fact that "plans can recoup", the plan administrator in that case had violated 502(a)(1)(B) in recovering accidental overpayments by reducing the plaintiffs' monthly payments. The Phillips court wrote:

> When a plan does not specifically allow for recoupment, but nevertheless it does so, it exercises extra-statutory devices to do so. By reducing the Plaintiffs' monthly benefits to recoup past overpayments, Maritime has availed itself of the common law remedy of restitution. Hence, the focus of this opinion is whether Maritime was entitled to use this equitable doctrine of restitution. The resolution of this question is dispositive of the case. … As the court will explain below, consideration of the equities in this case and ERISA's guiding principles has led the court to conclude that restitution is not an appropriate remedy.

194 F. Supp.2d at 555.

The application of equitable factors is necessarily fact-specific. However, the Phillips court offered some guidance in writing that "while fault [on the part of the Board] does not necessarily preclude restitution, a party's culpability is an appropriate equitable consideration." Id.

In Johnson, the court relied upon a Sixth Circuit decision which cited with approval a section of Scott on Trusts providing that:

> Whether repayment would be inequitable depends on the beneficiary's disposition of the money which he was overpaid, the amount of the overpayment, the nature of the mistake made by the administrator, the amount of time which has passed since the overpayment was made, and the beneficiary's total amount of income and the effect recoupment would have on that income.

2007 WL 649280 at *6, citing Wells v. United States Steel & Carnegie Pension Fund, 950 F.2d 1244, 1251 at n. 4 (6th Cir. 1991).

14

Further guidance on assessing the equitable factors related to recoupment is found in Verizon Employee Benefit Committee v. Adams, Civ. No. 2:07-476, 2007 WL 4150928 (W.D. Pa. Nov. 19, 2007), a case brought by an ERISA plan seeking a preliminary injunction to prevent dissipation of an accidental overpayment. The Verizon judge denied the defendant payees' motion to dismiss the action. She wrote, however:

> [I]f a Plaintiff were entitled to proceed under a federal common law theory, its entitlement to recovery would be similarly governed by general equitable principles. … That is, while a Plan's negligence in making a mistaken payment does not, in itself, bar restitution, the Court considers various factors, such as the fiduciary's culpability and the extent of the beneficiary's reliance on erroneous pension information and payments, in weighing the equities of restitution in the particular case.

2007 WL at *5.

Taking into consideration all of the caselaw discussed above, it appears possible that – as happened in Phillips – a Board's wrong application of, or a failure to apply, equitable principles before exercising recoupment of Plan overpayments and assessing interest could constitute the abuse of discretion necessary to support a claim for benefits under 29 USC §1132(a)(1)(B). I am influenced by the observation in Johnson that principles of trust law compel an ERISA trustee to balance the impact of an overpayment upon the beneficiaries as a whole against its impact against the individual from whom it seeks to recover overpayments.

As discussed below, Crossey has not made a showing that he relied to his detriment upon the Plan's misrepresentations. However, it is clear from the Johnson and Verizon decisions that this is only one among "various factors" to be weighed in considering the equities of recoupment.

15

It should also be noted that, where courts have found that broad powers given to a Board by a Plan supported the Board's right to recoupment, they have looked at the specific powers given by the Plan. It is not enough simply to point to any broad powers. In Pilger, the court described the plan at issue as containing "broad language *granting Defendants discretion to take remedial action*." 725 F.3d at 926. (Emphasis supplied). In Phillips, the court relied in part upon a sentence providing that none of the listed powers (which did not include those pertaining to recoupment) should be interpreted as "limiting the generalities of the foregoing." 2007 WL at **5-6. This aspect of the case is not fully briefed yet.

For these reasons, Count II of the Complaint will not be dismissed.

C.  Crossey Has Not Stated An Adequate Claim For Equitable Estoppel

Crossey's third claim seeks to equitably estop Defendants from recouping the overpayment, under Section 502(a)(3) of ERISA. To succeed on an equitable estoppel claim, an ERISA plaintiff must establish (a) a material misrepresentation; (2) reasonable and detrimental reliance upon the misrepresentation; and (3) extraordinary circumstances. Jenkins v. Union Labor Life Co., 543 F. App'x. 180, 183 (3d Cir. 2013), citing Curcio v. John Hancock Mutual Life Ins. Co., 33 F.3d 226, 235 (3d Cir. 1994). In demonstrating reliance, a plaintiff must have taken some action as result of the misrepresentation; the mere expectation of a continued benefit is not enough. Shook v. Avaya, Inc., 625 F.3d 69, 73 (3d Cir. 2010).

The existence of a material misrepresentation in this case is not disputed. In Crossey's 2014 Pension Plan Statement, which was given to him in March, 2015, and thereafter, PSEA erroneously overestimated the monthly retirement benefit to which Crossey was entitled. Crossey has not, however, shown the required reliance.

16

Crossey alleges that he relied to his detriment upon PSEA's misrepresentations in retiring from the School District, rolling over funds from his PSERS account to purchase the additional service credits, and "in otherwise planning for his retirement." Complaint at ¶104. He further alleges that, had he "been accurately apprised of the true amount of his retirement benefit, he would have made different decisions regarding the disposition of various retirement assets." Id. at ¶105.

However, as described above, Crossey retired from the School District in 2013, and rolled over funds from his PSERS account to purchase additional service credits in 2014. PSEA did not misrepresent the monthly benefit to which he was entitled until 2015. Logically, Crossey could not have relied upon 2015 and 2016 misrepresentations in making decisions in 2013 and 2014.

According to Crossey, he purchased his service years in reliance upon the 2013 calculations of the Plan's then-actuary, Milliman, Inc. Complaint at ¶ 38. He argues that he misunderstood "the nature and significance of the calculation", and that Todd Park, who ratified the purchase, failed to correct his "apparent misunderstanding as to how his pension benefit would be calculated." Id. at ¶40. Yet, Crossey has not alleged that PSEA or its actuary, did anything to cause his "misunderstanding" or even knew of it. Milliman's calculation pertained only to the purchase price of the service years. As discussed with regards to Crossey's first claim, this price was correct. Crossey has not alleged that – in 2013 – Milliman, or anyone at PSEA, made any representation to him at all as to the benefit amount he would receive upon retirement.

Moreover, the Plan itself was not deceptive in this regard. As discussed above, Section 6.2(c) specified that a purchaser's "Accrued Pension attributable to the service purchase" would be calculated "as if such Member had continued to be compensated by the Association for the same percentage of employment" for which he was compensated on his date of hire, *unless* additional payment was made.

Clearly, no action taken by Crossey before he received his 2014 Pension Plan Statement can be considered reliance upon PSEA's misrepresentation. Further, although Crossey referred in his Complaint to "otherwise planning for his retirement," it is clear from his response to Defendants' motion that he is not pointing to any actions he took in 2014 or afterward as reliance: in discussing "planning for his retirement", Crossey refers solely to paragraph 50 of his Complaint, which mentions only his "electing to retire from the School District" and "rolling over the funds from his PSERS account." Response at 26.

Crossey attempts, to some extent, to avoid dismissal on the basis that he has alleged reliance. However, as explained above, allegations which are no more than conclusions are not sufficient to withstand a 12(b)(6) motion to dismiss. See Connelly, supra, at 809 F.3d at 787. Crossey has not pleaded the existence of facts which would support his allegation. It is true that no discovery has as yet been undertaken, but that is irrelevant here: Crossey would not need discovery to know of his own detrimental reliance. Accordingly, this count of Crossey's complaint will be dismissed.

D.     Crossey's Claim for Reformation

Reformation is the judicial reforming or re-writing of a document, such as a contract, to make it reflect the true agreement of the parties. Pearce v. Chrysler Group LLC Pension Plan, 893 F.3d 339, 347 (6th Cir. 2018). Before reformation may be ordered, the plaintiff must show either (1) mutual mistake, or (2) that one party was mistaken, and the other committed fraud or engaged in inequitable conduct. Cunningham v. Wawa, Inc., 387 F. Supp.3d 529, 542 (E.D. Pa. July 2, 2019), citing Amara v. CIGNA Corp., 775 F.3d 510, 525 (2d Cir. 2014). Unlike with equitable estoppel, a plaintiff need not show reliance to obtain reformation. Id.

There can be no reasonable claim of mutual mistake here as it pertains to the requirements of the Plan. Instead, Defendants erred in failing to apply some of the Plan terms in calculating Crossey's retirement benefit.

Nor is there evidence of fraud. "Fraud" in the context of equity has a broader meaning than it does at law, and intention to defraud or misrepresent is not a necessary element. Pearce, supra, citing SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 193 (1963). Equitable fraud can comprise any act or omission which either involves a breach of duty, or by which an undue and unconscientious advantage is taken by another. Capital Gains, supra, at 194.

Nevertheless, as the District Court for the Southern District of New York has noted, if equitable fraud did not require that a party have taken "undue advantage" of the other party, it would be a doctrine of strict liability. Osberg v. Foot Locker, Inc., 138 F. Supp. 517, 557-8 (S.D.N.Y. 2015); see also In re Cendant Corporation Securities Litigation, 72 F. Supp.2d 498, 504 (D.N.J. 1999) ("The primary reason for reform in the case of unilateral mistake … is to prevent the other party from taking 'unfair advantage' of the mistaken party").

19

Crossey has not alleged that PSEA took undue advantage of any mistake on his part, or even that it was aware of his mistake. PSEA does not appear to have had anything to gain by selling Crossey pension plan credit years at a price lower than that required by the Plan, or by calculating his retirement benefit at a mistakenly high figure. It is therefore clear that Crossey will not be able to obtain relief under the doctrine of reformation.

E.    The Claim for Injunctive Relief

In Crossey's final claim, Count V, he seeks injunctive relief under Section 502(a)(3). As Defendants have conceded, this claim essentially stands or falls with reference to Count II, since it seeks relief for the same behavior alleged there. I have not dismissed Count II, and, therefore, Count V must remain in the case.

IV.    Conclusion

For the reasons discussed above, I will enter an Order granting Defendants' Motion to Dismiss in part, and denying it in part. Specifically, Counts I, III, and IV of Crossey's complaint will be dismissed without leave to amend, but Counts II and V will survive this motion.

BY THE COURT:

/s/Jacob P. Hart
_____
JACOB P. HART
UNITED STATES MAGISTRATE JUDGE